IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TYRA RULEVISH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:06-cv-211-DRH |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by United States District Judge David R. Herndon pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on the Petition for Review of the Commissioner's Decision Denying Benefits filed by Tyra Rulevish ("Plaintiff") on March 13, 2006 (Doc. 1).  For reasons set forth below, it is **RECOMMENDED** that Plaintiff's petition be **GRANTED**, that the Commissioner's decision be **REVERSED**, that this matter be **REMANDED** to the agency for further review consistent with this Court's order, and that the Court adopt the following findings of fact and conclusions of law:

### FINDINGS OF FACT

### PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits on August 1, 2003, alleging an onset date of March 19, 2003 (Tr. 43-46).  Her claim was initially denied on September 9, 2003 (Tr. 21), and upon review on January 15, 2004 (Tr. 20).  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on May 10, 2005 (Tr. 529-59).  After the hearing, the ALJ issued an unfavorable decision on August 10, 2005 (Tr. 13-18).  On February 2,

2006, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review (Tr. 4-8).

Plaintiff filed this suit in the U.S. District Court for the Southern District of Illinois on June 9, 2005.  Plaintiff argues that the ALJ's decision is not supported by substantial evidence because he substituted his own opinion for a treating physician's opinion.  Plaintiff also argues that the ALJ's findings are against the manifest weight of the evidence.

The Commissioner argues that the ALJ's decision is supported by substantial evidence and that Plaintiff's instant petition for review improperly seeks to interject medical evidence that was not in the record upon which the ALJ based his decision.

## SUBSTANTIVE HISTORY

**Medical History**

Plaintiff was 32 years old at the time of the ALJ's decision (Tr. 534).  Plaintiff went to the emergency room 19 times between March 11, 2003 and February 22, 2005 (Tr. 205-30, 304-13, 325).  On February 12, 2003, a Magnetic Resonance Imaging ("MRI") scan of Plaintiff's brain was normal (Tr. 195).  On May 19, 2003, Plaintiff was admitted to the hospital because her headaches had not responded to medication (Tr. 242).

On July 21, 2003, Dr. Lori M. Guyton, a neurologist, examined Plaintiff and prepared a written report (Tr. 196).  In the report, Dr. Guyton indicated that Plaintiff told him that: (1) she had been experiencing headaches on an almost daily basis; (2) she experienced nausea and vomiting at times during the headaches; (3) she had to lie down when her headaches occurred and the chance of the headaches prevented her from driving; (4) her headaches prevented her from working since March 19, 2003; (5) her headaches usually lasted a long time and did not go

2

away on their own; (5) she had been diagnosed by her primary care physician with cluster headaches; (6) she has been prescribed Depakote, Topamax, Neurontin, Toprol, Effexor, Prozac, and Elavil; (7) she received morphine sulfate, Demorol, Vistaril, or Compazine during emergency room visits; (8) she had, at times, read until midnight and had been trying to complete an academic course on the computer; (9) she smoked a pack of cigarettes per day; and (10) she enjoyed the swimming pool and sometimes rode her bike (Tr. 196-197). Dr. Guyton further noted that Plaintiff had undergone tubal ligation seven years prior and sinus and septum reconstruction two years prior (Tr. 196). Next, he noted that Plaintiff was taking Butalbitol, Tylenol, Ibuprofen, Celexa, Inderal LA, Naproxen, Oxycodone, and Hydroxazine and that her symptoms represented a migraine headache with a strong rebound component (Tr. 197-198). Dr. Guyton encouraged Plaintiff to exercise more, maintain a headache diary detailing the severity and frequency of her headaches, and refrain from eating within two hours of going to bed (Tr. 198). He also recommended to her that she discontinue her narcotics and non-steroidals for several weeks so that other treatments could be implemented (Tr. 198).

On September 15, 2003, Dr. Gautam Jha prescribed Toradol, Phenergan, and Fiorinal in response to Plaintiff's complaints of headaches (Tr. 203). On September 22, 2003, Plaintiff told Dr. Jha that her headaches had resolved (Tr. 202). On November 3, 2003, Plaintiff was again admitted to the hospital after complaining that her headaches were not responding to medication (Tr. 231). On August 20, 2004, a Magnetic Resonance Angiogram ("MRA") of Plaintiff's cerebral arteries and caratoid arteries was normal (Tr. 302).

On November 3, 2003, Dr. Jha gave Plaintiff Dihydroergotamine ("DHE") after she complained of severe migraine headaches (Tr. 231). The dosage caused Plaintiff nausea, so she

refused further dosages (Tr. 231). She refused all other treatments at that time and signed herself out of the hospital despite Dr. Jha's medical advice to the contrary (Tr. 231).

On November 17, 2003, Plaintiff was treated at the Diamond Clinic of St. Joseph Hospital in Chicago ("Diamond Clinic") for complaints of a week-long bout of severe headaches (Tr. 285). Dr. Betsy Pepper diagnosed the condition as migraine headache without aura (Tr. 285). Plaintiff was discharged on November 22, 2003 in stable condition and with plans to follow-up at the Diamond Clinic as Dr. Pepper's outpatient on December 22, 2003 (Tr. 287).

On January 4, 2004, Dr. Clement Gotway, a state agency physician, reviewed Plaintiff's medical records and evaluated her impairments and residual functional capacity (Tr. 173-80). Dr. Gotway found that Plaintiff had a history of migraine headaches and that she had experienced severe headaches three to four times a month (Tr. 180). Dr. Gotway noted that Plaintiff's treating physician indicated that she could not maintain gainful work due to her frequent headaches (Tr. 179). He also noted that her MRI and CT scans were normal (Tr. 179). Dr. Gotway then noted Plaintiff's July 2003 statements to Dr. Guyton that she read, worked on the computer, and rode a bicycle (Tr. 179). Dr. Gotway concluded that Plaintiff retained the capacity to perform light work that did not require exposure to hazards (Tr. 180).

**Hearing Testimony**

Both Plaintiff and a vocational expert, Dr. Darrell Taylor, testified at the hearing. In response to questions asked by the ALJ, Plaintiff testified that, two years prior, she had begun taking a computer-based home study course on medical billing (Tr. 536). She testified further that she did not complete the computer-based course and that she no longer used the computer because the glare on the screen made her head hurt (Tr. 536-37). She also testified that, two

4

years prior, she regularly swam and rode her bicycle (Tr. 536). She testified to her ability to read, write, and do simple math (Tr. 537).

Next, Plaintiff testified that she worked at a state facility as a mental health and physical disabilities technician until March 2003, which was when her headaches got really bad (Tr. 537-38). She testified that, as a technician, she cared for persons with disabilities, assisting them with feeding, bathing, shaving, dressing, and interacting (Tr. 539). She then testified that she had done that work for four years before voluntarily leaving the job (Tr. 538). She also testified that she had not worked for wages or as a volunteer since June 2003 (Tr. 539). When the ALJ asked her about the kind of work she performed before being a technician, Plaintiff testified that she had worked on an assembly line in a electrical fuse factory for four years (Tr. 539). She testified that the job sometimes entailed the use of tweezers to assemble small components of electrical fuses (Tr. 540). Plaintiff also testified that, prior to working at the fuse factory, she worked for one year at a fast food restaurant, where she performed cooking, cashiering, serving, and cleaning tasks (Tr. 541).

Plaintiff then testified that her migraine headaches limited her ability to work (Tr. 541). She testified that the pain usually occurred in her right temple, but sometimes occurred in her left temple (Tr. 542). She next testified that she took Ibuprofen, Imitrex, Tylenol, and Percocet for pain relief (Tr. 542). She further testified that she sometimes used ice packs on the top of her head and at other times used a heating pack on her neck while lying in a dark room (Tr. 542). She described the headaches as "stabbing, throbbing, [and] painful" and testified that their frequency was three or four times per week, with their duration ranging from several hours to three days (Tr. 542). Plaintiff testified that smells, sounds, lights, and movement make the pains

worse (Tr. 543). Plaintiff testified that the headaches limited her ability to walk more than ten feet, stand more than 15 minutes, bend over, stoop, or squat (Tr. 543-544). She stated that she was seeing Dr. Jha once or twice a month and that the medication he prescribed worked at times (Tr. 543). She also testified that she could make a fist, sit, and had feeling in both hands (Tr. 544). However, she testified that she was unable to use her hands to hold eating utensils while she had headaches because her hands got shaky (Tr. 544). She testified further that she could lift about 30 pounds (Tr. 544). She testified that the headaches did not give her trouble breathing, hearing, or seeing, although she did indicate that she could not watch television during the headaches (Tr. 544-555). Plaintiff responded yes when the ALJ asked whether she had a headache during the hearing (Tr. 543). She stated that the headache rated a four on a scale from zero to ten, with ten being the worst possible headache (Tr. 543).

 Next, Plaintiff testified that she slept eight hours per night and did not need medication to do so (Tr. 545). She testified that she was able to bathe, dress, and perform personal hygiene without help (Tr. 545). She indicated that her husband cooked meals when she felt ill, and that her son (from a previous marriage) would come to her house every morning after 6:00 a.m., whereby she would dress him, feed him, and help him with his homework before sending him off to school at 7:45 a.m. (Tr. 546-547). After her son was gone, she would spend the rest of the day cleaning the house and resting (Tr. 547). She testified that her housecleaning tasks included vacuuming, washing dishes, and starting the laundry (Tr. 547). She stated that she does not shop alone because certain perfumed smells made her sick (Tr. 548). She testified further that she enjoyed crocheting and shopping at times, but that she had given up computers (Tr. 548).

 Next, Plaintiff testified that she had been experiencing headaches since she was ten years

6

old, and that they had gotten progressively worse over the years (Tr. 548). She testified that they had gotten so bad that she could not work (Tr. 549). She testified further she was not experiencing symptoms or taking medication for other medical conditions apart from high blood pressure (Tr. 549). She testified that she did not belong to any clubs or organizations, and that she did not attend church (Tr. 549).

In response to questions posed by her attorney, Plaintiff testified that, back when she was employed by the state, she would miss two to three days a week owing to the headaches (Tr. 550). She testified that her headaches had gotten more severe since leaving that job (Tr. 550). She testified that she attempted to work at a grocery store for a month or two, but the smell of colognes and the cold drafts of air coming through the door gave her headaches (Tr. 555). She testified further that she had made trips to the emergency room and that doctors would put her in a dark room and medicate her intravenously until the headache subsided (Tr. 551). She testified that she had gone to the emergency room on the Tuesday preceding the hearing because her oral medications and self-administered injections were not relieving the pain (Tr. 551).

The ALJ then asked Plaintiff additional questions. In response to those questions, Plaintiff testified that she had received DHE dosages on at least two occasions, and that she terminated the procedure each time because they caused her difficulty in breathing and accelerated her pain (Tr. 552-54). She testified that she had been going to the Diamond Clinic in Chicago, but that she had to stop going because she could not afford to regularly travel the distance between Salem, Illinois and Chicago (Tr. 554). She also testified that she stopped taking narcotics and non-steroidal medications while she was being treated at the Diamond Clinic, but that she later resumed taking Imitrex and Percocet (Tr. 554).

Dr. Taylor then testified that Plaintiff's past work as a fast food worker as well as her work as a fuse assembler constituted light, unskilled work (Tr. 556). He testified that her job as a rehabilitation technician constituted medium, semiskilled work (Tr. 556). He then testified that Plaintiff would be able to do light, unskilled work at the time of the hearing if her functional capacity included lifting 20 pounds occasionally, 10 pounds frequently, standing, walking, and sitting six hours in an eight-hour day with normal breaks; and conditions included moderate exposure to hazards and unprotected heights (Tr. 557). He testified further that light, unskilled jobs such as hand packers substantially existed in the Illinois economy, but no work at any level would be available if Plaintiff were unable to lift, carry, stand, walk, and sit sufficient to complete an eight-hour day (Tr. 557).

## CONCLUSIONS OF LAW

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive[.]"); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2005) (stating that "the reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility") (quotation marks and citations omitted). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1972) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 101 (1938)). See also Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v. Shalala, 51 F.3d 96, 101

(7th Cir. 1995). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. See Golembiewski, 322 F.3d at 915; Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). This deferential standard applies, *inter alia*, to findings of the claimant's credibility. Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ's credibility determinations generally will not be overturned unless they were patently wrong."). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003); Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004) (stating that "an administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws") .

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. § 416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 416.920(c). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits ... physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). Third, the ALJ

determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. § 401, pt. 404, subpt. P, app. 1. If it does, then the Commissioner acknowledges that the impairment is conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. § 416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

Plaintiff's first argument is that the ALJ committed an error of law by substituting his own opinion for that of Dr. Syed Shah, the treating physician. The Commissioner's brief points out, however, that the reason the ALJ never considered that opinion is because Dr. Shah did not render it until January 4, 2006, which was eight months after the hearing and five months after the ALJ issued his written decision. Because this evidence was not before the ALJ, the Court cannot consider it in determining the correctness of his decision. Eads v. Secretary of Dept. of Health and Human Services, 983 F.2d 815, 817 ("The correctness of [the ALJ's] decision depends on the evidence that was before him."). Furthermore, although 42 U.S.C. § 405(g) permits a claimant to seek a remand on the basis of newly discovered evidence, Plaintiff has neither argued for a remand under that section, nor has she met the requirements for such a remand, including a showing that the material is both "new" and "material" as well as a showing

that there was good cause for her failure to include it in the earlier record. Perkins v. Chater, 107 F.3d 1290, 1296 (7th Cir. 1997).

Plaintiff's second argument contends that the ALJ's finding that Plaintiff could perform light, unskilled work was against the manifest weight of the evidence because, in so finding, he disregarded portions of Plaintiff's testimony as to the frequency of her headaches and the limitations they imposed upon her. In his written opinion, the ALJ listed three reasons as to why he found Plaintiff's testimony about her limitations "not entirely credible", to wit: (1) she told Dr. Guyton in July 2003 that she sometimes read until midnight, swam, took a computer-based course, and rode her bike, which supported the inference that she could perform light work while experiencing headaches; (2) she refused further DHE treatment after one dosage caused her nausea, which supported the inference that she was not committed to obtaining treatment for headaches that were supposedly debilitating; and (3) she did not complete the course of treatment at Diamond Clinic due to the inconvenience of the drive between Salem and Chicago, which supported the inference that her headaches were not as severe as she had described (Tr. 16). As stated above, the Court must evaluate the ALJ's findings of the claimant's credibility under a highly deferential standard. Zurawski, 245 F.3d at 887. However, the Zurawski court clarified that "where the medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations." Id. ("Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities."). For reasons described in depth below, the ALJ's finding that Plaintiff's testimony was not entirely credible is not supported by

11

substantial evidence.

The ALJ reasoned that Plaintiff's July 2003 statements that she read until midnight, swam, worked on her computer, and rode her bike indicated that she did not have the severe pain to which she testified, and that she could therefore perform light, unskilled work despite the pain. However, the ALJ's reasoning here cannot be affirmed – owing that it is identical to the reasoning an ALJ employed, and the Seventh Circuit rejected, in Vertigan v. Halter, 260 F.3d 1044, 1050 (2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities ... does not in any way detract from her credibility as to her overall disability. ... Activities such as walking in the mall and swimming are not necessarily transferable to the work setting with regard to the impact of pain."); see also Carradine, 360 F.3d at 756 (ruling that an ALJ committed "serious errors in reasoning" when he considered claimant's ability to engage in sporadic physical activities as evidence that her allegations of severe pain were exaggerated and not entirely credible). In light of the foregoing case law, the Court rejects the ALJ's reasoning here that Plaintiff's sporadic physical activity is sufficient to repudiate her testimony that the headaches caused severe and debilitating pain.

In support of his second proffered reason for doubting Plaintiff's credibility, the ALJ misstated the hearing testimony. Specifically, the ALJ concluded that Plaintiff rejected a November 2003 DHE procedure that she had not previously undergone and that had only caused her a single bout of nausea. To the contrary, Plaintiff testified that she had undergone DHE therapy at least once prior to November 2003, that it had caused her difficulty in breathing, and that it had exacerbated her pain (Tr. 552-554). Because the ALJ did not accurately discuss the Plaintiff's actual hearing testimony in his finding that the testimony was not entirely credible, the Court can accord no deference to the credibility finding itself. Id. ("The ALJ must specifically

12

identify what testimony is credible and what testimony undermines the claimant's complaints."); Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2007)("We require that an ALJ build an *accurate and logical* bridge from the evidence to his conclusion[.]") (emphasis added).

Similarly, the ALJ misstated the hearing testimony in reaching the conclusion that Plaintiff did not continue treatment at the Diamond Clinic due to the inconvenience of traveling. To the contrary, Plaintiff's testimony was that she could not afford the continued expense of making the 260-mile trip between Salem and Chicago (Tr. 554). To be sure, Plaintiff's financial inability to make continuous trips to and from Chicago does not necessarily entail that she felt them to be inconvenient. More importantly, the ALJ did not specifically identify testimony supporting his conclusion that Plaintiff felt that the trips were merely inconveniencing rather than unaffordable. His conclusion was thus unsupported in the record and unreasonable. In light of the foregoing discussion, the Court finds no support in the record for the ALJ's finding that Plaintiff discontinued treatment at the Diamond Clinic due to a feeling that the trip was a mere inconvenience to her. This third finding of the ALJ, as does the two preceding it, "lacks evidentiary support" and therefore cannot stand. Lopez ex. rel, 336 F.3d at 539.

Furthermore, as Plaintiff points out, the combination of evidence showing her frequent trips to the emergency room, her history of being prescribed drugs for the pain, her past tendency to miss work, and her testimony as to the severity of the pain cumulatively indicates that she would not be able to sustain employment under her disability. Although the ALJ ultimately concluded that Plaintiff could sustain her past relevant work, he did not incorporate into his discussion an explanation of why those above relevant factors, corroborated by the vocational expert's testimony that the frequency of the headaches would preclude any work, were insufficient to support a finding that she could not indeed sustain that work. See Carradine, 360 F.3d at 755 (ruling that a claimant's hearing testimony of severe pain was sufficiently

13

corroborated by documentation in the medical history that the claimant frequently visited the emergency room complaining of pain and that medical personnel invariably prescribed medication to alleviate that pain); see also Zurawski, 245 F.3d at 887 ("where the medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations."). The ALJ's failure here to explain his consideration *vel non* of relevant evidence requires a remand. See Scott, 297 F.3d at 595 (requiring that the ALJ "build an accurate and logical bridge from the evidence to his conclusion").

Because the ALJ's findings are not supported by substantial evidence, incorporate logical flaws, and do not include an adequate discussion of the issues, it is hereby **RECOMMENDED** that Plaintiff's petition be **GRANTED**, that the Commissioner's decision be **REVERSED**, that this matter be **REMANDED** to the agency for further review consistent with this Court's order, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties shall have ten (10) days after service of this Recommendation to file written objections thereto. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004); United States v. Hernandez-Rivas, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: August 8, 2007**

               s/ *Donald G. Wilkerson*
               **DONALD G. WILKERSON**
               **United States Magistrate Judge**