IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**TYRA RULEVISH,**

**Plaintiff,**

**v.**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF**
**SOCIAL SECURITY,**

**Defendant.**                                                   **No. 06-CV-0211-DRH**


### MEMORANDUM and ORDER

**HERNDON, District Judge:**

### I. Introduction, Background and Facts

Now before the Court is a Report and Recommendation ("the Report") submitted by Magistrate Judge Donald J. Wilkerson (Doc. 28).  The Report recommends that the Court reverse the Commissioner's decision and remand this matter to the agency for further review.  The Commissioner filed objections to the Report (Doc. 29).  Based on the following, the Court finds that the Administrative Law Judge erred in denying Rulevish's application for disability insurance benefits, adopts the Report in its entirety and remands this case for further review.

On August 1, 2003, Rulevish filed an application for disability insurance benefits under the Social Security Act alleging that she had been disabled since March 19, 2003 due to migraine headaches.  This claim was initially denied and denied again after reconsideration (R. 22-29).  Rulevish filed a request for hearing

on April 6, 2004. (R. 31).  On May 10, 2005, the Administrative Law Judge George A. Mills ("ALJ") held a hearing at which Rulevish testified and Darrell W. Taylor testified as a vocational expert.  On August 10, 2005, the ALJ issued an unfavorable decision as to Rulevish finding that Rulevish is not totally disabled (R. 10-18). Thereafter, Rulevish filed a request for review of hearing decision with the Appeals Council. (R. 9).  On February 2, 2006, the Appeals Council denied Rulevish's request, thereby rendering it a final Agency decision (R. 4-6).  On March 13, 2006, Rulevish timely filed her complaint in this Court seeking judicial review pursuant to **42 U.S.C. § 405(g)** (Doc. 1).

On August 8, 2007, Magistrate Judge Wilkerson issued a Report recommending that the Court reverse the Agency's decision and remand this matter to the Agency for further review because the ALJ's findings were not supported by substantial evidence, incorporate logical flaws and do not include an adequate discussion of the issues.  The Report was sent to the parties with a notice informing them of their right to appeal by way of filing "objections" within ten days of service of the Report.  To date, the Commissioner filed objections to the Report (Doc. 29). Since timely objections have been filed, this Court must undertake *de novo* review of the Report.  **28 U.S.C. § 636(b)(1)(B); FED. R. CIV. P. 72(b); Southern District of Illinois Local Rule 73.1(b); *Govas v. Chalmers*, 965 F.2d 298, 301 (7th Cir. 1992)**.  The Court may "accept, reject or modify the recommended decision."  ***Willis v. Caterpillar Inc.*, 199 F.3d 902, 904 (7th Cir. 1999)**.   In making this determination, the Court must look at all the evidence contained in the record and

give fresh consideration to those issues to which specific objection has been made. *Id.*

## II. <u>Medical History</u>

At the time of the ALJ's decision, Rulevish was 32 years old (R. 534). She graduated from high school. (R. 63, 535). Between March 11, 2003 and February 22, 2005, she went to the emergency room 19 times (R. 205-30, 304-13 & 325). A February 12, 2003 Magnetic Resonance Imaging ("MRI") scan revealed Rulevish's brain as normal. (R. 195). On May 19, 2003, Rulevish was admitted to the hospital because her headaches had not responded to medication. (R. 242).

On July 21, 2003, Dr. Lori M, Guyton, a neurologist, examined Rulevish and prepared a written report. (R. 196). Dr. Guyton's report states that following regarding Rulevish and her headaches: (1) she had been experiencing headaches on an almost daily basis; (2) she sometimes experienced nausea and vomiting during the headaches; (3) she had to lie down when she had a headache and that the chance of a headache prevented her from driving; (4) her headaches prevented her from working since March 19, 2003; (5) her headaches usually lasted a long time and did not go away on their own; (6) her primary care physician diagnosed her with cluster headaches; (7) she has been prescribed Depakote, Topamax, Neurontin, Toprol, Effexor, Prozac, and Elavil; (8) she also received morphine sulfate, Demorol, Vistaril, or Companzine during her trips to the emergency room; (9) she had, at times, read until midnight and had been trying to complete a course on the computer; (10) she smoked a pack of cigarettes per day; and (11) she enjoyed swimming and riding her

bike. (R. 196-97).  Dr. Guyton noted that Rulevish was taking Butalbitol, Tylenol, Ibuprofen, Celexa, Inderal LA, Naproxen, Oxycodone and Hydroxazine and that her symptoms represented a migraine headache with a strong rebound component. (R. 197-98).   Dr. Guyton recommended that Rulevish exercise more, maintain a headache diary, and refrain from eating within two hours of going to bed. (R. 198). He also told her to discontinue her narcotics and non-steroidals for several weeks so that other treatments could be implemented. (R. 198).

Next, Rulevish saw Dr. Gautam Jha on September 15, 2003. (R. 203). Dr. Jha prescribed Toradol, Phenergan and Fiorinal for her headaches. (R. 203).  On September 22, 2003, Rulevish told Dr. Jha that he headaches had resolved. (R. 202).

On November 3, 2003, Rulevish was admitted to the hospital in Salem, Illinois for headaches. (R. 231).  She was non-functional and crying.  (R. 231).  She was placed on dihydroergotamine ("DHE") (R. 231).  The DHE made her nauseous and she declined further DHE. (R. 231).  She also declined further treatment, signed AMA and was sent home. (R. 231).

On November 17, 2003, Rulevish was admitted and treated at the Diamond Clinic of St. Joseph Hospital in Chicago ("Diamond Clinic") for complaints of a week-long bout of severe headaches. Dr. Betsy Pepper diagnosed Rulevish as having status migraine without aura. (R. 285).  Dr. Pepper discharged Rulevish in stable condition on November 22, 2003. (R. 285).  Rulevish was ordered among other things to follow up with visits at the Diamond Clinic, keep a headache calendar and have biofeedback before her December 22, 2003 office appointment.  (R. 287-88).

On January 4, 2004, Dr. Clement Gotway, a state agency physician, reviewed Rulevish's medical records and evaluated her impairments and residual functional capacity. (R. 172-80). Dr. Gotway found that Rulevish had a history of migraine headaches and that she had experienced severe headaches three to four times a month. (R. 180). Dr. Gotway noted that Rulevish's treating physician indicated that Rulevish could not maintain gainful work due to her frequent headaches and that she went to the emergency room for her medication. (R. 179). He also noted that the MRI and CT scans were normal. (R. 179). He further noted Rulevish's July 21, 2003 statements to Dr. Guyton that she read, worked on the computer and rode a bike. (R. 179). Dr. Gotway found that Rulevish should be capable of light work that is not hazardous. (R. 179). On August 20, 2004, Rulevish had a Magnetic Resonance Angiogram ("MRA") of her cerebral arteries and caratoid arteries which came back normal. (R. 302).

### III.  Plaintiff's Testimony

At the hearing, Rulevish testified that she began taking a computer-based home study course on medical billing two years ago. (R. 536). She also stated that she did not finish the computer course and that she no longer uses the computer because the glare on the screen made her head hurt. (R. 536-37). She also stated that two years ago she swam and rode her bike (R. 536).

She worked at a state facility as a mental health and physical disabilities technician until March 2003 (R. 537-38). As a technician she cared for people by

helping with feeding, bathing, shaving, dressing and interacting. (R. 539).   She voluntarily left the job.  (R. 539).  She had not worked for wages or as a volunteer since June 2003. (R. 539).  Prior to her work as the technician at the state facility, Rulevish worked on the assembly line at Little Fuse for years making small fuses. (R. 539).  At this job, she used tweezers to assemble small components of electrical fuses. (R. 540).  Before the job at Little Fuse, Rulevish worked for one year at a fast food restaurant where she performed cooking, cashiering, serving, and cleaning tasks. (R. 541).

Rulevish stated that her migraines headaches limit her ability to work. (R. 541).  The pain is usually in her right temple and sometimes her in her left temple. (R. 542).  She takes Ibuprofen, Imitrex, Tylenol and Percocet for pain relief. (R. 542).  She sometimes used ice packs on the top of her head and at other times used a heating pack on her neck while lying down in a dark room. (R. 542).  She described her headaches as stabbing, throbbing, and painful and that the headaches last four or five hours to two or three days and that they occur three or four times a week. (R. 542).  Rulevish testified that smells, sounds, lights and movement make her headaches worse.  (R. 543).

Rulevish testified that she sees her treating physician once a month for the headaches unless she has problems then she goes twice a month.  (R. 543).  She also testified that the medications he prescribed worked sometimes (R. 543).  She also stated that the headaches limit her ability to walk more than ten feet, stand more than 15 minutes, bend over, stoop or squat (R. 543-44).  She asserted that when she

is having a headache she cannot use her hands to hold eating utensils because her hands get shaky. (R. 544).  She stated that she can probably lift thirty pounds when she does not have a headache. (R. 544).  Her headaches do not affect her breathing, hearing or vision , however, she did state that she cannot watch television when she has a headache. (R. 544-45).  She testified that she had a headache during the hearing. (R. 543).

Next, Rulevish testified that she slept eight hours a night and did not need medication to do so. (R. 545).  She is able to bathe, dress and perform personal hygiene without help. (R. 545).  She cooks when she feels good. (R. 545).  She also testified that her son would come to her house every morning after 6:00 a.m. and that she would dress, feed and help him with his homework before he caught the school bus at 7:45 a.m. (R. 546-47).  She stated that she is not always able to do this with him. (R. 546).  She testified that after her son leaves that she would clean the house when she can and rest. (R. 547).  Her husband takes her shopping as she cannot go alone because of the smells. (R. 547).  She testified that she likes to crochet when she is able to do so, but that she has given up computers, sewing and shopping. (R. 548).

She further testified that she has been experiencing headaches since she was ten years old and that they have gotten progressively worse. (R. 548).  She testified that they are so bad she cannot work. (R. 548).  She stated that when she was employed by the state that she would miss two to three times a week and that she would work two hours out of an eight hour day. (R. 550).  Since she left that job, her

headaches have gotten more severe and more frequent. (R. 550).  After the job as a technician, she tried working at a small grocery store for about a month or two, but that the smell of colognes and cold air coming in the door would give her headaches. (R. 550).  She testified that when she goes to the emergency room, she is placed in a dark room and medicated intravenously until the headache subsides.  (R. 551).  The week before the hearing she was at the emergency room because the medications did not work on her headache. (R. 551).

As to the DHE, Rulevish testified that she had been given the DHE on at least two occasions and that she terminated the procedure each time because she cannot breathe. (R. 552-54).  She testified that she stopped going to the Diamond Clinic in Chicago because it was "getting too hard to get to Chicago every two months. It was too expensive – too much.  We couldn't do it.  Finances were bad." (R. 554).

### IV.  Vocational Expert Testimony

During the May 10, 2005 hearing, Taylor testified that Rulevish's past work history of semiskilled labor as a nurse's aid required the medium level of exertion and of unskilled labor as a fuse assembly worker and as a fast food worker both of which required light exertion. (R. 556).  Taylor further testified that Rulevish did not acquire any skills from her past relevant work that are transferable to other jobs (R. 556).   The following colloquy transpired regarding Revulish's residual functional capacity:

> Q: Well, it appears that we have a Claimant that's between the ages of 30 and 32, which is defined in the Regulations as a younger individual.  She clearly has a high school education and the past relevant unskilled and semiskilled work at the light and medium level

that you've identified.  I want you to consider a hypothetical that such an individual could lift 20 pounds occasionally, 10 pounds frequently, stand, walk, and sit six hours in an eight-hour day with normal breaks. She should never climb ladders, ropes or scaffolds.  She could occasionally climb ramps and stairs.  And avoid moderate exposure to the hazards of any moving machinery and unprotected heights because of headaches and the medications that she's taking may indicate some dizziness or problems related to headaches – severe headaches. Considering that hypothetical, would she be able to do her past work?

A: The fuse assembler and the fast food worker, but not the nurse aide.

Q: Okay.  At the light exertional level, could you also identify any unskilled jobs that the Claimant could perform in addition to the work that she did in the past, just for my benefit?

A: Yes.   There are other light unskilled jobs such as hand packers.  The State of Illinois, approximately 13,000, light.  There are other types of assembler positions, too, which would include approximately the area of 38,000 light unskilled positions.

Q: Okay.  If I assume that the testimony of the Claimant is completely credible and the level of her headaches were as to the level of she's not able to lift, carry, stand, walk, and sit sufficient to complete an eight-hour workday and it affects her ability to maintain attention and concentration to perform even simple routine unskilled tasks – considering that hypothetical and consider that it's consistent with her medical evidence, would the jobs that you've identified be eliminated?

A: Yes, they would.

Q: Would it preclude the fuse assembly work and the fast food work from her past?

A: It would.

Q: Okay.  Can you identify anything she could do?

A: No.

Q: Okay.  Is all of your testimony consistent withe the Dictionary of Occupational Titles?

A: It is.

ALJ: Mr. Drummond, do you have anything you'd like to ask?

ATTY: [INAUDIBLE].  In reference to the general economy, what's the tolerance level for an employer where you were missing [INAUDIBLE]?

VE: Yes.  It's been my testimony in the past that if an individual, particularly in these unskilled jobs, missed even two days a month over a two or three-month period they would result in termination.

(R. 556-58).

## V.  <u>Administrative Decision</u>

After taking the matter under advisement, the ALJ issued a decision unfavorable to Rulevish on August 10, 2005.  The ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's status headaches without aura is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

4.  This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand or walk or sit for 6 hours in an 8-hour workday with normal breaks; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; avoid even moderate exposure to hazards such as moving machinery and unprotected heights; and has not other limitations.

7.  The claimant's past relevant work as fuse assembly worker and fast food worker did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.  The claimant's medically determinable status headaches without aura does not prevent the claimant from performing her past relevant work.

9.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.152(f)).

(R. 17-18).

## VI.  <u>Standard of Review and Applicable Law</u>

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive … ."  **42 U.S.C. § 405(g)**.  Thus, the Court reviews the Commissioner of Social Security Administration's

decision to deny benefits to determine whether it was supported by substantial evidence or is the result of an error of law. **Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003); Schmidt v. Apfel, 201 F.3d 970, 972 (7th Cir. 2000)**. Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. **Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000)**. In this review of the ALJ's decision, the Court will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] own judgment for that of the Commissioner." **Lopez, 336 F.3d at 539; see also Clifford, 227 F.3d at 869**. If an ALJ's decision lacks evidentiary support or an adequate discussion of the issues, then it cannot stand. **Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002)**. And while the ALJ must have built a "logical bridge from the evidence to his conclusion[,]" *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), we will nonetheless "give the opinion a commonsensical reading rather than nitpicking at it," **Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000) (quoting Johnson v. Apfel, 189 F.3d 561, 564 (7th Cir. 1999))**.

A claimant is only qualified for disability benefits where she is found to be disabled within the meaning of the Act. **42 U.S.C. § 423(a)(1)(E); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005)** The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The SSA has

interpreted this statute to mean that both the impairment and the inability to engage in "substantial gainful activity" must last for 12 months. **65 Fed.Reg. 42774 (2000);** ***Barnhart v. Walton,* 535 U.S. 212, 219-20 (2002) (upholding SSA's construction of the term "disability" as requiring an inability to engage in substantial gainful work for 12 months)**.

In determining whether a claimant is disabled, an ALJ must employ a now-familiar five-part test, considering whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. ***Briscoe,* 425 F.3d at 351-52 (citing 20 C.F.R. §§ 404.1520, 416.920)**. An affirmative answer in steps one, two, or four leads to the next step, while an affirmative answer to either steps three or five requires a finding of disability. ***Id.* at 352**. A negative response at any step other than step three ends the inquiry and requires a finding that the claimant is not disabled. ***Clifford,* 227 F.3d at 868 (citing *Zalewski v. Heckler,* 760 F.2d 160, 162 n. 2 (7th Cir. 1985))**. The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. ***Briscoe,* 425 F.3d at 352**.

## VII.  Analysis

In the case at bar, the ALJ found as to Rulevish's credibility:

The claimant testified that she has migraine headaches with a stabbing, throbbing pain that can last for two to three days and occur two to three times a week.  She asserted that she takes Imitrex and Percocet when the pain is severe in addition to using ice on the top of her head and lying in a dark room.  She further stated that smells, lights and movement aggravate her headaches.  The claimant further testified that her headaches were so bad she could not do housework.  Her daily activities include making sure her 11-year-old son is dressed, clean and ready for school when he comes to her house in the morning.  (The claimant's first husband has custody of said child).  She crochets sometimes and cooks if she feels good.  The claimant also stated she could watch television unless she had a headache, slept eight hours a night and took care of her personal hygiene.  The claimant further testified that she could lift 30 pounds and had no limitations on sitting.  She also stated that her headaches limit her walking 10 feet, standing for 15 minutes at a time and that she was not able to bend, stoop or squat.  She asserted that she was right-handed and had no problems with grip, feeling or manipulation.

The claimant's testimony is not entirely credible.  The undersigned would note the claimant told Dr. Guyton she read until midnight at times, was taking a course on the computer, enjoyed swimming and sometimes rode her bike.  The claimant also did not complete a course of treatment at the Diamond Headache Program in Chicago.  She asserted it was difficult to drive to Chicago.  In addition, as indicated above, the claimant refused DHE treatment or any other intervention and left against medical advice when hospitalized in November, 2003 after suffering some nausea with her first dosage of DHE.  The undersigned is of the opinion that if the claimant's headaches were truly debilitating she would not have refused a new (for her) form of treatment and refused any other treatment after a single bout of nausea.

(R. 16).

When assessing credibility, resolution of competing arguments based on the record is for the ALJ, not this Court. ***Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002)**.  The ALJ's credibility findings are entitled to substantial deference, ***Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)**, but the ALJ's determination must be supported by the record evidence and be sufficiently specific

to make clear to the claimant and to any subsequent reviewer the weight given to the claimant's statements and the reasons for that weight. ***Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003)**. The Court notes that evaluating the credibility of pain, fatigue and other subjective complaints are fraught with uncertainty. Nonetheless, the ALJ must take care to articulate which information he relies upon when making his determinations and findings. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (ALJ must evaluate which allegations are credible and which are not credible); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (ALJ must sufficiently articulate his assessment of the evidence to allow the court to trace the path of the reasoning); *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) (where ALJ fails to mention rejected evidence, the reviewing court cannot discern if significant evidence was credited or simply ignored)**. The ALJ may not reject subjective symptoms as not credible in a conclusory manner without providing reasoning for such a rejection. ***Szulyk v. Heckler*, 575 F.Supp. 1266, 1269 (N.D. Ill. 1984)**. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement. For example, under SSR 96-7p, the ALJ must consider: daily activities; the type dosage, effectiveness, and side effects of medication taken by the claimant; treatment other than medication used to alleviate pain; and the reasons the claimant may not seek treatment for the pain. **SSR 96-7p**.[1] Once the claimant produces medical

---

[1] SSR 96-7p, in its entirety, includes: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any

evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. ***Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004)**.

Here, Magistrate Judge Wilkerson found that the ALJ's assessment that Plaintiff's testimony was not entirely credible is not supported by the substantial evidence, misstated the hearing testimony and did not include an adequate discussion of the issues.  In his objections, the Commissioner argues that Magistrate Judge Wilkerson erred when he found that the ALJ had insufficiently evaluated the credibility of Rulevish's symptoms, improperly relied upon relied on Rulevish's activities to find that her symptom complaints did preclude a range of light work, and improperly characterized her testimony.  First, the Commissioner contends that the ALJ considered the appropriate factors set forth in the regulations when he assessed Rulevish's credibility and properly characterized the record evidence.

Based on the record before the Court, the Court does not agree with the Commissioner.  The record is replete with testimony and medical evidence that dispel such a finding that she lacked credibility about her pain and physical limitations.  ***See Vertigan v. Halter*, 260 F.3d 1044 (7[h] Cir. 2001)("As revealed by the medical reports, Ms. Vertigan's constant quest for medical treatment and pain relief refutes such a finding.")**.  The record clearly demonstrates the frequency

---

medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for fifteen to twenty minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

and severity of her headaches.  Rulevish visited the emergency room at least 19 times in a twenty-three month period.  In fact, in November 2003, Rulevish was admitted to the hospital because of a headache and remained in the hospital for five days. (R. 14).  Furthermore, Rulevish testified that she could do just about anything when she did not have a migraine but that when she was experiencing a migraine should could not do anything but lie down in a dark and quiet room.  She also testified that her headaches generally last four or five hours to two or three days and that the headaches occur three to four times a week. (R. 542).  She also testified that when she was working at the state facility she would miss two to three days a week because of her headaches. (R. 550).

Next, the Commissioner contends that the ALJ did not misstate the hearing testimony in giving his reasons for discounting Rulevish's credibility.  Specifically, the Commissioner argues that the ALJ relied on the doctor's report that stated Rulevish was placed on a dihydroergotamine (DHE) treatment protocol and given her first dose of DHE, but then complained of nausea, declined further DHE treatment, declined any other medical intervention, wished to go home within a few hours of admission, and signed out against medical advice.   The Court rejects this objection.  Rulevish testified that she had undergone the DHE treatment at least one time prior to her rejecting it in November 2003; that she could not breathe while taking the DHE and that it caused her more pain. (R. 552-554).  As the Report correctly notes, the ALJ did not accurately discuss this hearing testimony in his finding that her testimony was not entirely credible, thus, the Court cannot afford

deference to this finding.

As to the vocational expert's testimony that the frequency of her headaches would preclude any work, the Commissioner argues that the ALJ gave specific reasons for finding that Rulevish's pain complaints were not fully credible, reasonable credited only those restrictions supported by the record as a whole and rejected those which were unsupported.  The Court rejects this argument.  As noted by Magistrate Judge Wilkerson, the frequent trips to the emergency room, her history of being prescribed drugs for the pain, her past tendency to miss work because of headaches and her testimony as to the severity of the pain reveal that Rulevish might not be able to sustain employment.  The ALJ did not discuss these factors nor did he discuss Taylor's testimony that the frequency and severity of the headaches would preclude Rulevish from performing any work.  Thus, there is medical evidence of an underlying impairment and the Court finds that the ALJ did not sufficiently specify and discuss Rulevish's headaches to properly support his finding that she was not credible and that her headaches do not preclude her from returning to her past relevant work.  Thus, the ALJ's conclusions were insufficient to support a finding that she could sustain her past relevant work.  **See Carradine**, **360 F.3d at 756** **(ruling that a claimant's hearing testimony of severe pain was sufficiently corroborated by documentation in the medical history that the claimant frequently visited the emergency room complaining of pain and that medical personnel invariably prescribed medication to alleviate that pain)**.

### VII.  <u>Conclusion</u>

Page 17 of  18

Accordingly, the Court **ADOPTS** the Report (Doc. 28).  The Court **REVERSES** the Commissioner's decision and **REMANDS** this matter to the Social Security Agency for further review consistent with this Order.  Further, the Court **DIRECTS** the Clerk of the Court to enter judgment in favor of Tyra Rulevish and against Michael J. Astrue, Commissioner of Social Security.

**IT IS SO ORDERED.**

Signed this 6th day of September, 2007.

/s/      DavidRHerndon
United States District Judge